UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

PERRY CROSBY,

        Petitioner,

        - against -

NEW YORK STATE,

        Respondent.

-----------------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT
★   MAR 01 2010
P.M.
TIME A.M.

**MEMORANDUM AND ORDER**

06-CV-1570-ENV

**VITALIANO, D.J.**

*Pro Se* Petitioner Perry Crosby seeks a writ of habeas corpus pursuant to 28 U.S.C. §
2254 challenging his 2003 state court conviction for criminal possession of a controlled
substance and marijuana, criminally using drug paraphernalia, and endangering the welfare of a
child.  The petition is grounded on two theories of relief: (1) the trial court erroneously denied
Crosby's motion to suppress certain physical evidence of illegal drugs, and (2) he was deprived
of a fair trial when the jury learned that he had a prior criminal history.

For the reasons set forth below, Crosby's writ is denied and his petition is dismissed.

## Background

### I.    Events Leading to Trial

The evidence adduced at trial established that, in March 2002, New York City police
began an investigation of 41-03 10th Street, Apartment 4-E, located in the Long Island City
Queensbridge Housing development. (Transcript of Record, People v. Crosby, Indict. No.
10396/02 (Queens County Ct. 2002) ("Trial Tr.") at 300.)  On April 6, 2002, police executed a
search warrant for narcotics at the three-bedroom apartment, blowing the door open with a

hydraulic tool. (Id. at 301-03.) While searching the apartment, emergency services found that one of the bedroom doors was barricaded, and heard from within a male voice saying that there was a baby inside. (Id. at 425.) Police forced open the door, extracting petitioner, a female, and a baby. (Id. at 426-28.) Police ultimately discovered petitioner, Shamecca Gibson, Mary Gibson, Tatanish Gibson, and five children inside the apartment. (Id. at 329, 334.)

By the time that arresting officer Michael Potenza entered the residence, all four of the adults were rear-handcuffed in the living room. (Id. at 329, 336.) Potenza searched the bedroom that had been barricaded and recovered 46 rocks of crack-cocaine, an electronic scale, 16 bags of marijuana, a marijuana pipe, a bag containing empty Ziploc bags, numerous cell phones, and a beeper from the top of a bureau. (Id. at 330-32, 346.) Although Potenza had not yet announced that he had found narcotics, Shamecca Gibson yelled out "those drugs are mine" and "they're all mine" while he was still searching the bedroom. (Id. at 388-91.)

When Crosby was informed that he was going to be taken to the police precinct, wearing only boxer shorts and a white T-shirt, he asked for a pair of jeans that were on the floor of the bedroom where police had found the drugs. (Id. at 336-37.) Potenza testified at trial that he picked up the jeans and squeezed them to make sure there were no concealed weapons. (Id. at 337.) After police put the jeans on petitioner, Potenza searched the pockets for smaller objects and discovered a small bag containing 14 rocks of crack cocaine. (Id.) The police brought the physical evidence back to the precinct for vouchering (id. at 338-40) and Crosby was subsequently indicted.

## II. Procedural History

On May 15, 2003, following a jury trial in Queens Supreme Court, Crosby was convicted of the following crimes: criminal possession of a controlled substance in the third, fourth, and

fifth degrees, N.Y. Penal Law §§ 220.16[1], 220.09[1] & 220.06[5]; criminally using drug

paraphernalia in the second degree, N.Y. Penal Law § 220.50[2], [3]; endangering the welfare of

a child, N.Y. Penal Law § 260.10[1]; and criminal possession of marijuana in the fifth degree,

N.Y. Penal Law § 221.10[2]. On June 13, 2003, he was sentenced to concurrent prison terms,

the longest of which was 8.5 to 17 years for the third degree possession conviction.

A.    The Pre-Trial Evidentiary Hearing

On October 22, 2002, the court conducted a Mapp hearing in which petitioner argued for

suppression of the physical evidence recovered from the pockets of Crosby's jeans. At the

hearing, the prosecution called Potenza, who recounted his retrieval of the jeans at Crosby's

behest. (Transcript of Hearing, People v. Crosby, Indict. No. 10396/02 (Queens County Ct. Oct.

22, 2002) ("Hr'g. Tr.") at 17-18.) On cross-examination, defense counsel focused on an alleged

inconsistency that Crosby pointed to his pants in the bedroom despite being handcuffed with his

hands behind his back in the living room. (Id. at 30.) Potenza responded that Crosby "basically

motioned with a finger behind his back toward that location" and acted out that motion before

the court. (Id. at 30-31.) He also explained that after he picked up the pants, Crosby verbally

confirmed that it was the pair he requested. (Id. at 32.) Finally, Potenza stated that the drugs

were only recovered from the jeans after police put them on petitioner. (Id. at 34.)

Following this testimony, defense counsel argued that Potenza's story "with respect to

the recovery of those narcotics [in the jeans] was incredible and not worthy of belief" because

the police wanted to pin the drugs on Crosby to strengthen their case. (Id. at 50.) Arguing that

Crosby could not have pointed to the jeans in light of the restraints, counsel also claimed that the

fact that "the officer would take the pair of pants off of the floor, put them on my client and then

search the pants" was beyond belief because a "reasonable officer" concerned about weapon

possession – as Potenza had testified he was – would have searched the pants "prior to them going on the body". (Id. at 51.) The prosecution rested on the record. (Id. at 52.)

The court reserved decision until October 31, at which time it issued a written decision explaining, without further detail, that "Crosby's application to suppress physical evidence is denied for the reasons placed on the record."

B.    The Mistrial Motion

At trial, the prosecution called several police officers and lab technicians to establish Crosby's possession of narcotics, and the defense called Mary Gibson, a tenant in the raided apartment, to explain that Crosby did not live at that location. The only other witness called at trial to give testimony relevant on this point was Crosby's parole officer, Thomas Silagi.

In his opening statement, the prosecutor told the jury that they would hear testimony from "Mr. Silagi . . . an employee of the State of New York, and one of his responsibilities is to maintain the addresses of certain citizens in our state. The defendant is one of those citizens." (Trial Tr. at 288.) The purpose of the testimony was to demonstrate that at one point Crosby gave Silagi "as his residential address as his home 41-03 10th Street, Apartment 4-E" and that therefore the drugs were in Crosby's avowed residence. (Id.) The prosecutor did not reference the fact that Silagi was Crosby's parole officer, presumably in light of New York's prohibition against admitting evidence of past criminal history unless a defendant testifies or places his character in issue. See N.Y. Crim. Proc. Law § 60.40; People v. Mullin, 41 N.Y.2d 475, 479, 393 N.Y.S.2d 938, 941, 362 N.E.2d 571, 573-74 (1977). However, due to an inadvertent error by the prosecution in preparing the witness sheets, when Silagi was called to the stand on the following day, the court reporter stated: "The People call Thomas Silagi, New York State Department of Parole." (Trial Tr. at 456.)

The trial court immediately called both parties to sidebar, at which the prosecutor

admitted fault for the disclosure and apologized for the oversight. (Id. at 456-57.) The court

acknowledged that "this is a real serious issue" (id. at 460) and that the "mentioning of the name

that he's a parole officer is something that right now I think is prejudicial", but accepted that it

was inadvertent and reserved judgment on whether to declare a mistrial. (Id. at 461.) Both sides,

however, were receptive to the court's suggestion that Silagi be withdrawn and a stipulation that

presented his testimony but excluded his name and title be crafted. (Id. at 457-58.) The court

hoped to "finesse" the situation by presenting such stipulation after the testimony of subsequent

witnesses so as to create a temporal distance between Silagi's withdrawal and his testimony.[1]

(Id. at 459.) Still, defense counsel expressed concern that "this witness is now identified as a

parole officer, [and] I don't think that bell can be unrung. I would make the application that in

the event that we cannot reach a stipulation, I would ask for a mistrial." (Id. at 458.)

Over the course of a brief recess, the parties jointly crafted a stipulation. (Id. at 463-67.)

During this process, defense counsel and the court had the following exchange:

> Mr. Brackley: We are working it out, Judge. The only thing is just for the record, I
> believe in absence of this stipulation my motion for mistrial would be denied is that ---
>
> The Court: As it stands now, yes, in absence of the stipulation since there was no mention
> at all at this time that this Mr. Silage in his position as a parole officer had anything to do
> with the defendant.
>
> Mr. Brackley: So then, Judge, I believe we are in a position to work out a stipulation . . . I
> think we can resolve it. (Id. at 465.)

When the jurors returned to the courtroom, the court explained to them that the "witness

is withdrawn. He has nothing to add with regard to this matter after discussion of the case." (Id.

---

[1] For example, the court believed that although it "tell[s] jurors not to speculate, they could think that parole has something to do with Tatanish [Gibson] because she said she was on parole in New York." (Id. at 463.) When informed that Tatanish was actually on probation, not parole, the Court explained that it doubted the jury's sophistication on such matters such that they would make a meaningful distinction between the two. (Id. at 463-64.)

at 468.) Following a lunch recess and the testimony of one other police officer, the prosecution

rested its case after presenting the following stipulation to the jury:

> It is hereby stipulated by and between the district attorney and the defense, the following: Defendant, Mr. Perry Crosby, was under a legal obligation to provide truthful and accurate information as to his home address to the State of New York. On September 27th of 1999, the defendant, to meet his obligation, officially stated that he lived at 220 East 115th Street, apartment . . . 12-B, which apartment was leased to someone by the name of Simone Edmond. In continuing his obligation, the defendant advised the State of New York on September 24th of the year 2001 that he had moved to 41-03 10th Street in the borough of Queens, apartment 4-E, that on February 6th of this year the defendant advised the State of New York that he had moved out of 41-03 10th Street, Apartment 4-E and moved to 55 Monroe Street in Brooklyn, New York. (Id. at 496-97.)

The issue of the mistrial re-surfaced at the June 13 sentencing hearing. Petitioner,

speaking on his own behalf, told the court that his attorney told him that there was a mistrial but

also "that I don't want a mistrial because I could still win this case and that we would have to

start all over again." (Transcript of Hearing, People v. Crosby, Indict. No. 10396/02 (Queens

County Ct. June 13, 2003) at 13.) Petitioner alleged that he received ineffective assistance in

light of his attorney's failure to "object to this matter." (Id. at 14.) Defense counsel asserted that

"the record should reflect that there was a motion for mistrial made", to which the court replied

"I know what I said. I know what motions were made and I know what my rulings were. I

understand that the record is clear." (Id. at 18-19.) The court then sentenced petitioner, stating

that "[t]here was more than ample evidence to justify the conviction of you of the various

charged for which you were convicted" and that the "evidence was overwhelming." (Id. at 21.)

### C. Post-Trial Proceedings

In September 2004, petitioner appealed his conviction, arguing that (1) the trial court

erred in refusing to suppress the evidence found in his jeans because Potenza's testimony at the

Mapp hearing was incredible and "patently tailored to meet constitutional objections", and (2) he

was deprived of a fair trial when the jury learned that he had a criminal history. (Brief for

Appellant, Appeal Docket # 03-6455, dated September 2004 ("App. Br.") at 14, 20.) On

February 22, 2005, the Appellate Division, Second Department rejected both arguments and

affirmed the convictions. People v. Crosby, 15 A.D.3d 592, 790 N.Y.S.2d 524 (2nd Dep't 2005).

The appeals court found that the hearing court "credited the testimony of the arresting officer

that the defendant, although rear handcuffed, physically and verbally motioned and verbally

referred to a pair of jeans on the bedroom floor", and that "[c]ontrary to the defendant's

contention, this testimony was not incredible as a matter of law in that it was not manifestly

untrue, physically impossible, contrary to experience, or self contradictory." Id. at 593 (internal

quotation marks omitted). The court also held that the trial court "providently exercised its

discretion in denying the defendant's motion for a mistrial." Id.

On June 20, 2005, the New York Court of Appeals denied Crosby leave to further appeal

his conviction.[2] People v. Crosby, 5 N.Y.3d 761, 801 N.Y.S.2d 255, 834 N.E.2d 1265 (2005).

D.      Habeas Corpus

On March 30, 2006, Crosby filed the instant petition for a writ of habeas corpus, arguing

the same two points that he made on appeal to the Second Department. Respondent has not

disputed – and the Court assumes for purposes of this motion – that the petition was timely filed

and that the claims asserted were properly exhausted in the state courts.

**Discussion**

**I.      The AEDPA Standard**

Under the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat.

1214 (1996) ("AEDPA"), a writ of habeas corpus shall not issue with respect to any claim that

---

[2]      Petitioner subsequently filed a motion for re-sentencing in state court pursuant to the Drug Law
Reform Act of 2004. On September 9, 2008, the Second Department affirmed the lower court's
order to deny re-sentencing. People v. Crosby, 54 A.D.3d 771, 862 N.Y.S.2d 909 (2nd Dep't
2008). The Court of Appeals denied leave to appeal that decision. People v. Crosby, 11 N.Y.3d
831, 868 N.Y.S.2d 606, 897 N.E.2d 1090 (2008).

was adjudicated on the merits in state court unless the state court's adjudication (1) was contrary to or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d); see Gutierrez v McGinnis, 389 F.3d 300, 304 (2d Cir. 2004) (describing this standard as "AEDPA deference"). A state court decision is "contrary to" established federal precedent if it "contradicts the governing law set forth in [Supreme Court] cases" or arrives at a different conclusion from the Supreme Court on "materially indistinguishable" facts. Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 1519-20 (2000). A state court decision involves an "unreasonable application" of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of" that case. Id. at 413. Further, the state court's application must have been "objectively unreasonable" for a writ to issue. Id. at 409; see Francis S. v. Stone. 221 F.3d 100, 111 (2d Cir. 2000) (explaining that the standard requires "[s]ome increment of incorrectness beyond error").

In addition, under AEDPA, "a state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" Drake v. Portuondo, 553 F.3d 230, 239 (2d Cir. 2009) (quoting 28 U.S.C. § 2254(e)(1)). "This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility." Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003).

## II.     Suppression of Evidence

Petitioner argues that the trial court erred in admitting the drugs found in his jeans into evidence, because Potenza's testimony at the Mapp hearing was both incredible and patently tailored to meet constitutional objections. Although petitioner does not explicitly invoke federal

law as grounds for habeas review, his claims can only be understood as alleging that the failure

to suppress this physical evidence constituted a violation of his Fourth Amendment rights to be

free of unconstitutional search and seizure. Indeed, the "Mapp hearing" itself references the

Supreme Court's decision in Mapp v. Ohio, which held that under the Fourth and Fourteenth

Amendments, "all evidence obtained by searches and seizures in violation of the Constitution is .

. . inadmissible in a state court." 367 U.S. 643, 655, 81 S. Ct. 1684, 1691 (1961).

The problem for petitioner, however, is that a federal court's authority to review a Fourth

Amendment claim in a § 2254 application is severely limited. In Stone v. Powell, 428 U.S. 465,

482, 96 S. Ct. 3037, 3046 (1976), the Supreme Court held that "where the State has provided an

opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not

require that a state prisoner be granted federal habeas corpus relief on the ground that evidence

obtained in an unconstitutional search or seizure was introduced at his trial." See Palacios v.

Burge, 589 F.3d 556, 561 (2d Cir. 2009) (noting that Stone "bars us from considering Fourth

Amendment challenges raised in a petitioner's petition for habeas relief"); Graham v. Costello,

299 F.3d 129, 134 (2d Cir. 2002) (explaining that Stone's "bar to federal habeas review of

Fourth Amendment claims is permanent and incurable" unless the state fails to provide "a full

and fair opportunity to litigate the claim"). To demonstrate the requisite lack of opportunity,

petitioner must show that the state either (a) "has provided no corrective procedures at all to

redress the alleged Fourth Amendment violations", or (b) "has provided a corrective mechanism,

but [he] was precluded from using that mechanism because of an unconscionable breakdown in

the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992); see Grayson v.

Artus, 08-CV-0493, 2010 U.S. Dist. LEXIS 7870, at *17-*18 (E.D.N.Y. Feb. 1, 2010); Daniels

v. New York, 07-CV-0448, 2009 U.S. Dist. LEXIS 74889, at *34 (E.D.N.Y. Aug. 21, 2009).

Neither situation exists here. As an initial matter, petitioner fails to satisfy the first prong because "federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710.10 *et seq.* . . . as being facially adequate." Capellan, 975 F.2d at 70 n.1 (internal quotation marks and citations omitted); see Brewster v. New York, 08-CV-4480, 2010 U.S. Dist. LEXIS 4660, at *31 (E.D.N.Y. Jan. 21, 2010); Goodwin v. Duncan, 03-CV-0031, 2009 U.S. Dist. LEXIS 102964, at *15 (W.D.N.Y. Aug. 11, 2009). Nor can petitioner demonstrate an "unconscionable breakdown", such as "the hearing judge fail[ing] to make a reasoned inquiry", Angeles v. Greiner, 267 F. Supp. 2d 410, 417 (E.D.N.Y. 2003), "yield[ing] to mob intimidation of the jury" or "not provid[ing] rational conditions for inquiry into federal-law . . . questions." Capellan, 975 F.2d at 70. On the contrary, petitioner took full advantage of the New York procedures, participating in a pre-trial evidentiary hearing and raising the same suppression issues to the Second Department on appeal. Crosby's "mere dissatisfaction or disagreement with the outcome of [his] suppression motion is not sufficient to establish that an 'unconscionable breakdown' occurred" in violation of his Fourth Amendment rights. Goodwin, 2009 U.S. Dist. LEXIS 102964, at *16-*17 (citing Capellan, 975 F.2d at 71; Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977)).

As there can be no doubt that Crosby had a full and fair opportunity to litigate his suppression claim in the New York courts, this Court is without authority to review that aspect of his habeas petition.[3] Therefore, the refusal of the state courts to suppress the narcotics found in Crosby's jeans cannot serve as grounds for habeas relief.

---

[3] The Court would not necessarily be barred from review of the suppression issue if it was the basis of a Sixth Amendment claim for ineffective assistance of counsel. See Kimmelman v. Morrison, 477 U.S. 365, 379-80, 106 S. Ct. 2574, 2585-86 (1986). However, petitioner never followed up on his statements at his sentencing hearing by bringing any such claim in the state courts.

Assuming *arguendo* that the Court has the power to grant the writ on this ground, petitioner still cannot show entitlement to relief. "It is well-settled that '[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus.'" Grayson, 2010 U.S. Dist. LEXIS 7870, at *31 (quoting Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983)). To obtain relief, petitioner must demonstrate both that the court's ruling was incorrect and that the error "deprived [him] of a fundamentally fair trial." Id. Petitioner's claim that Potenza's testimony was incredible and patently tailored attacks the trial court's fact-finding and crediting the challenged testimony in making its ruling. Thus, Crosby must not only demonstrate that the trial court's factual determination was "unreasonable" pursuant to 28 U.S.C. § 2254(d)(2), but also rebut by clear and convincing evidence the § 2254(e)(1) presumption that the court's credibility determination was correct. See Cotto v. Herbert, 331 F.3d 217, 233 (2d Cir. 2003); Cherry v. Walsh, 09-CV-1452, 2009 U.S. Dist. LEXIS 75373, at *20-*21 (E.D.N.Y. Aug. 25, 2009).

Petitioner provides the Court with no facts sufficient to overcome AEDPA deference. He merely re-hashes the same concerns about Potenza's testimony that were rejected by the Second Department, and tacks on the conclusory and unsupported claim that Potenza's testimony was "to[o] convenient for the purpose of justifying the action that was taken." (Pet'r Reply Br. at 2.) Although petitioner was free at trial to impeach Potenza on cross-examination and attack the weight of his testimony by arguing that it was inconsistent or incredible, the Court cannot say that the trial court was objectively unreasonable in admitting the evidence in the first place, or that the Second Department was unreasonable in accepting the trial court's determination on this score. Nor could the Court find that even an erroneous refusal to suppress this evidence would have deprived Crosby of a fundamentally fair trial, as the record amply demonstrates both that he

was afforded sufficient due process and that there was bountiful evidence unrelated to the search

of the jeans that could have led to Crosby's conviction.

## III.  Prior Criminal History

Petitioner also claims that he was deprived of a fair trial and due process under the

Fourteenth Amendment because the jury learned of his prior criminal history from the

prosecution's opening statement and the subsequent announcement of Silagi's position as a

parole officer.  On this point, there is no adverse evidentiary ruling for petitioner to attack; the

trial court never condoned evidence of Crosby's prior convictions, and no one ever disputed that

such evidence was inappropriate.  Instead, petitioner must argue that the trial court, having

acknowledged the seriousness of the inadvertent disclosure and the potential prejudice to his

defense, was obligated to declare a mistrial once his criminal history was revealed.[4]

Petitioner's claim, however, does not survive the strictures of AEDPA.  As explained

above, a state court ruling must violate "clearly established federal law, as determined by the

United States Supreme Court" to support a habeas petition.  28 U.S.C. § 2254(d).  Unfortunately

for Crosby, the Supreme Court has never held that the admission of prior bad acts evidence to

prove the guilt of a defendant would violate due process or constitute grounds for habeas relief.

See Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir. 2003) ("There is no clearly established

Supreme Court precedent which holds that a state violates due process by permitting propensity

evidence in the form of other bad acts evidence.").  In fact, the Supreme Court explicitly

declined to reach the issue "whether a state law would violate the Due Process Clause if it

---

[4]    It is unclear from the record whether petitioner formally moved for a mistrial; defense counsel
       only stated that he "would make the application" for a mistrial "in the event that we cannot reach
       a stipulation". (Trial Tr. at 458.)  However, the Court does not accept respondent's invitation to
       rule that "petitioner waived any objection by agreeing to stipulate" (Resp. Br. at 16), as the
       Second Department rejected that contention in holding that the trial court "providently exercised
       its discretion in denying the defendant's motion for a mistrial."  In any event, the Court need not
       address waiver to dispose of this petition, as discussed infra.

permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."

Estelle v. McGuire, 502 U.S. 62, 75 n.5, 112 S. Ct. 475, 483 (1991). Therefore, even if the Court

accepted petitioner's contention that the jury was irrevocably tainted by the announcement of

Silagi's position, the court's denial of the mistrial motion could not have resulted in a decision

violative of AEDPA, and thus cannot support Crosby's habeas claim. See King v. Phillips, 03-

CV-6073, 2008 U.S. Dist. LEXIS 102515, at *12 (E.D.N.Y. Dec. 18, 2008); Schicchi v. Ercole,

06-CV-3273, 2007 U.S. Dist. LEXIS 18834, at *19-*20 (E.D.N.Y. Mar. 18, 2007); Roberts v.

Phillips, 03-CV-2957, 2004 U.S. Dist. LEXIS 3432, at *8 (E.D.N.Y. Feb. 4, 2004).

Of course, there is also significant doubt that petitioner was deprived of a "fundamentally

fair" trial by the unintentional disclosure of his parole officer. To rise to the level of a

constitutional violation, "the erroneously admitted evidence must have been 'sufficiently

material to provide the basis for conviction or to remove a reasonable doubt that would have

existed on the record without it.'" Grayson, 2010 U.S. Dist. LEXIS 7870, at *32 (quoting

Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998)). Here, any taint on the jury was far from

inevitable. Petitioner's claim depends on the jury piecing together two references separated by a

full day and several witnesses: the prosecution's reference in opening statement to "Mr. Silagi"

and his obligation to maintain the addresses of "certain citizens" including petitioner, and the

announcement of Silagi as a parole officer. The jury was never directly told that Crosby had

prior convictions or what crimes he had committed.

More importantly, any prejudice that may have existed was reduced by the trial court's

prompt handling of the issue. The court immediately called a sidebar following the

pronouncement of Silagi's position and did not hesitate in withdrawing the witness. Upon the

return of the jury, the court explained that the witness was withdrawn because he had "nothing to

add", and made no mention of the controversy. The parties jointly crafted a stipulation that completely avoided mention of Silagi, and that was read to the jury a few hours later, after another witness had testified. Although petitioner faults the trial court for not giving a "prompt curative instruction" (id. at 6), it is not clear how a curative instruction beyond the court's statement that the witness was irrelevant would have provided more relief. No testimony existed that needed to be stricken, and any more detailed instruction about Silagi to the jury may have further damaged petitioner by highlighting the witness's potential importance.

The trial court took very seriously its responsibility to safeguard Crosby's constitutional rights. Petitioner is not entitled to habeas relief based on that court's refusal to grant a mistrial.

## Conclusion

For all of the foregoing reasons, Crosby's petition for a writ of habeas corpus is dismissed with prejudice and the writ is denied. Since Crosby has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. 28 U.S.C. § 2253(c)(2). Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a) that any appeal from this Memorandum and Order would not be taken in good faith and therefore *in forma pauperis* is denied for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 920-21 (1962).

The Clerk of the Court is directed to enter judgment and to close this case.


SO ORDERED.

Dated: Brooklyn, New York
      February 25, 2010

ERIC N. VITALIANO
United States District Judge

14